**SO ORDERED.**

**SIGNED March 10, 2014.**



ROBERT SUMMERHAYS
UNITED STATES BANKRUPTCY JUDGE

_____

### UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

IN RE:

GREGORY S. EVERETT,                    CASE NO. 11-51175

    Debtor                             Chapter 7

----------------------------------------------------------------
RSL FUNDING, LLC,

    Plaintiff

VERSUS                                 ADVERSARY NO. 11-5027

GREGORY S. EVERETT,

    Defendant

----------------------------------------------------------------
### REASONS FOR DECISION
----------------------------------------------------------------

    The present matter before the court is an adversary proceeding commenced by RSL Funding, LLC against the debtor, Gregory S. Everett. RSL seeks a declaratory judgment that Everett assigned all of his rights to payments under a wrongful death settlement and that RSL is the owner of these payments. RSL also asserts a breach

of contract claim against Everett based on representations and warranties in the assignment agreement. The parties filed motions for summary judgment, and the court then took the motions and adversary complaint under advisement following a trial on the merits. After reviewing the record, the parties' arguments, and the relevant authorities, the court DENIES the motions for summary judgment on the grounds that there are genuine disputes of material fact that preclude judgment as a matter of law. The court rules as follows on the merits of the adversary complaint.

**BACKGROUND**

**A. The Settlement**

Everett settled a wrongful death claim on behalf of his mother's estate in 2008. The settlement documents included the Settlement Agreement and Release (the "Settlement Agreement") between the settling plaintiffs (including Everett) and various "released parties." (Joint Trial Exhibit ("Jt. Tr. Exh.") #11). The Settlement Agreement provides that the settling plaintiffs would each receive periodic payments over a certain period of time. Everett was to receive 120 guaranteed payments of $3,675.39 per month. To finance the periodic payments, the insurance carrier for the settling defendants paid $2,043,000 to PRUCO Assignment Corporation ("PRUCO") and assigned the released parties' payment obligations to PRUCO. This assignment is reflected in a separate

-2-

Assignment and Release Agreement dated September 15, 2008 (the "PRUCO Assignment"). This agreement further provides that the periodic payments to the settling plaintiffs would be funded by the purchase of an annuity contract (the "Annuity Contract")issued by Prudential Insurance Company of America ("PICA"). (Jt. Tr. Exh. #3). The PRUCO Assignment Agreement and the Annuity Contract provide that PRUCO is the owner of the Annuity Contract and has the exclusive right to direct payments under the contract.

Each of these settlement documents had restrictions on Everett's ability to assign his rights under the settlement. The Settlement Agreement provided that the periodic payments "cannot be accelerated, deferred, increased or decreased by the Plaintiffs or any Payee; nor shall the Plaintiffs or any Payee have the power to sell, mortgage, encumber, or anticipate the Periodic Payments, or any part thereof, by assignment or otherwise." (Jt. Tr. Exh. #11 at ¶3). The PRUCO Assignment Agreement similarly provides that "none of the Periodic Payments and no rights to or interest in any of the Periodic Payments ... can be accelerated, deferred, increased or decreased by any recipient of the Periodic Payments ... [and] [n]o claimant shall have the power to affect any transfer of payment rights, and any purported transfer shall be wholly void ab initio." (Jt. Tr. Exh. #2 at ¶7). The Annuity Contract similarly provides that PRUCO "shall have sole and exclusive ownership rights in this

-3-

Certificate" and that "no other person shall have any rights to anticipate, sell or absolutely assign (by any means regardless of form) payments under this Certificate and any attempted assignment will be void at the outset." (Jt. Tr. Exh. #3 at ¶2). The Annuity Contract also provides that the payments under the contract are subject to PRUCO's right to direct payments. (Id. at ¶4).

## B. The Assignment to RSL

RSL is a Texas limited liability company that acquires rights under structured settlements and other long-term receivables in exchange for lump sum cash payments. RSL's principal place of business is in Houston, Texas. In January 2009, Everett met with principals of RSL at its Houston offices and agreed to sell RSL approximately 108 of the 120 periodic payments (totaling $396,942) that he was due as part of the settlement. RSL agreed to pay Everett $216,000 in exchange for assigning his benefits under the settlement. RSL also provided Everett with an immediate cash loan of $1,000. The parties executed an Assignment Agreement (the "RSL Assignment Agreement") and a separate Bill of Sale in connection with the assignment. (Jt. Tr. Exh. #6, 7). The RSL Assignment Agreement provides that the payment of the $216,000 was contingent on "RSL Funding receiving documentation and such proof as RSL Funding may require, at its sole discretion, that the Assigned Payments can be properly purchased by it." (Jt. Tr. Exh. #6 at

-4-

¶7). The RSL Assignment Agreement further provides that RSL's obligation to make the $216,000 payment to Everett was contingent on the execution of "such agreements as RSL Funding and its affiliates may require, at its sole discretion, that the assigned payments are existing as represented and that they can be assigned" and that this would include "agreements with the Annuity Issuer [PICA]." (Id.). There is no dispute that the only payment made by RSL to Everett prior to the bankruptcy case was the initial $1,000 loan made in January 2009.

## C. Arbitration and Liquidation

Everett notified PICA that he had assigned his rights to receive the periodic payments and that payments under the Annuity Contract should be redirected to RSL. In February 2009, however, Everett's counsel notified RSL that Everett was cancelling the RSL Assignment Agreement. Everett testified at trial that he sought to cancel the Assignment Agreement because RSL had not followed through with the $216,000 payment and Everett was in need of money. Everett also notified PICA that he was no longer going through with the assignment. As a result, PICA notified RSL that it would not honor the assignment because the annuity payments were not transferable. (Jt. Tr. Exh. #16). RSL commenced an arbitration proceeding under the terms of the RSL Assignment Agreement, and RSL and Everett ultimately entered into a consent arbitration award

-5-

directing PICA to send the payments under the Annuity Contract to RSL. Although initially confirmed, this arbitration award was overturned on appeal on the grounds that PICA did not receive notice of the arbitration proceeding and thus was never made a party to the arbitration. RSL then obtained a corrected arbitration award that removed any reference to PICA or PRUCO. In July 2011, however, a Texas state district court declined to confirm this corrected arbitration award. The district court also vacated the arbitration awards in favor of RSL and ordered RSL to pay PICA's attorneys' fees.

**D.  The Present Bankruptcy**

Everett filed for relief under Chapter 11 of the Bankruptcy Code on August 12, 2011. The case was subsequently converted to a case under Chapter 7 on November 14, 2011. RSL filed two proofs of claim in the bankruptcy case totaling approximately $889,878. RSL also commenced the present adversary proceeding seeking a declaration that the RSL Assignment Agreement was valid and that it owns 108 of the settlement payments assigned pre-petition. RSL also asserts a breach of contract claim asserting that Everett breached representations and warranties in the RSL Assignment Agreement and failed to cooperate with RSL in finalizing the assignment with PICA. RSL contends that the annuity payments to Everett are not property of the bankruptcy estate because these

-6-

payments were sold prior to the petition date.

On December 19, 2012, the court granted PICA's motion to intervene in this adversary proceeding. PICA and Everett contend that the purported assignment of the periodic payments to RSL is invalid because of the anti-assignment language in the original Settlement Agreement, the PRUCO Assignment Agreement, and the Annuity Contract and that the assignment is invalid. RSL contends that Everett has waived his right to rely on these anti-assignment restrictions by entering into the assignment with RSL. Moreover, RSL contends that PICA is not a party to the Settlement Agreement or the PRUCO Assignment Agreement. PRUCO is not a party in this adversary proceeding and PICA does not purport to represent PRUCO in this proceeding. The parties subsequently filed motions for summary judgment. The court held a hearing on these motions and took the motions under advisement pending a trial on the merits of RSL's complaint.

## DISCUSSION

### A. Choice of Law

A threshold question for the court is choice of law because the parties dispute which states' law is applicable to RSL's claims. In <u>Klaxon Co. v. Stentor Elec. Mfg.</u>, the Supreme Court held that a court must apply the choice-of-law rules of the forum where it sits when the court's jurisdiction is based on diversity

-7-

of citizenship. <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The court is not explicitly bound by <u>Klaxon</u> because the court's jurisdiction in this case is grounded on bankruptcy jurisdiction under 28 U.S.C. § 1334(b), not diversity jurisdiction under 28 U.S.C. § 1332. Regardless, bankruptcy courts generally apply the choice-of-law rules of the forum state when the state law claims at issue do not implicate important federal policies. <u>Woods-Tucker Leasing Corp. of Ga. v. Hutcheson-Ingram Dev. Co.</u>, 642 F.2d 744, 748 (5th Cir. 1981); <u>In re Gaston & Snow</u>, 243 F.3d 599, 605 (2d Cir. 2001); <u>In re Merritt Dredging Co., Inc.</u>, 839 F.2d 203, 206 (4th Cir. 1988); <u>In re Southwest Equip. Rental, Inc.</u>, No. Civ. 1-90-62, 1992 WL 684872, at *9 (E.D. Tenn. July 9, 1992); <u>see also</u> <u>Warfield v. Carnie</u>, No. 3:04-CV-633-R, 2007 WL 1112591, at *7 (N.D. Tex. Apr. 13, 2007).

The resolution of RSL's claims will directly impact core bankruptcy matters, such as the allowance or disallowance of RSL's proofs of claim. However, RSL's claims center on questions of contract interpretation and enforcement under state law that do not implicate important federal policies. <u>See</u>, <u>e.g.</u>, <u>In re Endeavour Highrise, L.P.</u>, 432 B.R. 583, 628 (Bankr. S.D. Tex. 2010) ("Issues regarding contract interpretation and enforcement do not involve the type of important federal bankruptcy policy" that would require application of federal choice-of-law rules) (distinguishing <u>Tow v.</u>

-8-

<u>Rafizadeh (In re Cyrus II Partnership)</u>, 413 B.R. 609, 613 (Bankr. S.D. Tex. 2008)). Accordingly, in light of <u>Klaxon</u> and <u>Woods-Tucker Leasing</u>, the court will look to Louisiana choice-of-law rules.

Louisiana's choice-of-law rules are found in Louisiana Civil Code Articles 3515 <u>et</u> <u>seq</u>. Article 3515 sets forth the general policy underlying Louisiana's conflicts rules:

> Except as otherwise provided in this Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
>
> That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

Civil Code Article 3537 addresses the general choice-of-law rule applicable to conventional obligations:

> Except as otherwise provided in this Title, an issue of conventional obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
>
> That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state

-9-

to the parties and the transaction, including
the place of negotiation, formation, and
performance of the contract, the location of
the object of the contract, and the place of
domicile, habitual residence, or business of
the parties; (2) the nature, type, and purpose
of the contract; and (3) the policies referred
to in Article 3515, as well as the policies of
facilitating the orderly planning of
transactions, of promoting multistate
commercial intercourse, and of protecting one
party from undue imposition by the other.

Where, as here, the contracts at issue include choice-of-law
clauses that specify the law applicable to the contract, Louisiana
will enforce that contractual choice:

All other issues of conventional obligations
are governed by the law expressly chosen or
clearly relied upon by the parties, except to
the extent that law contravenes the public
policy of the state whose laws would otherwise
be applicable under Article 3537.

La. Civ. Code Art. 3540.

There is little dispute over the law applicable to the
Settlement Agreement and the PRUCO Assignment because both
agreements have choice-of-law clauses. Choice-of-law clauses are
enforceable under Louisiana law:

All other issues of conventional obligations
are governed by the law expressly chosen or
clearly relied upon by the parties, except to
the extent that law contravenes the public
policy of the state whose laws would otherwise
be applicable under Article 3537.

La. Civ. Code Art. 3540. The Settlement Agreement provides that it

-10-

is governed by Louisiana law. (Jt. Tr. Exh. #11 at ¶11). The PRUCO Assignment selects New Jersey law to govern the agreement. (Jt. Tr. Exh. #2 at ¶12). The RSL Assignment Agreement also contains a contractual choice-of-law clause, but the provision states "that any dispute over the terms of the assignment shall be resolved 'in accordance with the laws of the state of Texas **_or_** Louisiana....'" (Jt. Tr. Exh. #6 at ¶13a) (emphasis added). The parties dispute which law governs the RSL Assignment Agreement in light of the disjunctive language in this clause. RSL contends that Texas law applies because (1) the meetings between Everett and RSL occurred in Texas, (2) the agreement was executed in Texas, (3) the agreement was to be performed in Texas, and (4) the agreement provided for arbitration in Texas. PICA and Everett contend that Louisiana law should apply because the subject matter of the assignment is a Louisiana settlement agreement involving a Louisiana resident.

The parties' dispute over the application of Texas or Louisiana law under the choice-of-law clause is relevant to the resolution of RSL's claims only if the applicable law of the two jurisdictions is in conflict. Even without a contractual choice-of-law clause, the court would have to address the threshold question of whether there is a true conflict, a false conflict, or no conflict among the laws of the states that have a connection to

-11-

the RSL Assignment Agreement. <u>In re Combustion, Inc.</u>, 960 F.Supp. 1056, 1067 (W.D. La. 1997); <u>Tolliver v. Naor</u>, 115 F.Supp.2d 697, 701 (E.D. La. 2000). If the laws of two states are substantially identical, then no choice-of-law analysis is necessary and the court need not "go through the motions" of making a choice of law determination. <u>Schneider Nat'l Transp. v. Ford Motor Co.</u>, 280 F.3d 532, 536 (5th Cir. 2002); <u>W.R. Grace & Co. v. Cont'l Cas. Co.</u>, 896 F.2d 865, 874 (5th Cir. 1990). Accordingly, the court will first address RSL's claims and determine choice of law only if there is a true conflict between the relevant laws of Texas and Louisiana.

## B. Validity of the RSL Assignment

Everett and PICA contend that the anti-assignment clauses in the Settlement Agreement and the Qualified Assignment and Release Agreement bar Everett from assigning any of his rights under the Settlement Agreement, including any right to receive annuity payments. As result, according to Everett and PICA, the RSL Assignment Agreement is void.[1] RSL contends that Everett waived

---

[1] Both Texas and Louisiana enforce anti-assignment clauses in contracts. <u>See Keller Foundations, Inc</u>., <u>The Wausau Underwriters Insurance Co</u>., 626 F.3d 871, 874 (5th Cir. 2010); <u>Texas Farmers, Ins. Co. v. Gerdes</u>, 880 S.W. 2d 215, 219 (Tex. App.--Fort Worth 1994, writ denied). Anti-assignment clauses can also be waived. <u>See</u>, <u>Johnson v. Structured Asset Services, LLC</u>, 148 S.W. 3d 711, 724-25 (Tex. App.--Dallas 2004, no writ); <u>In re Katrina Canal Breaches Litigation</u>, 63 So.3d 955, 958-59 (La. 2011) (anti-assignment clauses in insurance policies are enforceable based on Louisiana Civil Code Article 2653).

his right to enforce the anti-assignment clauses in the agreements when he entered into the RSL Assignment Agreement. RSL's waiver argument RSL also argues that PICA lacks standing to enforce the anti-assignment clauses because it is not a party to those agreements. These arguments, however, assume that the interest assigned under the RSL Assignment Agreement was Everett's rights under the *Settlement Agreement* as opposed to any purported rights under the Annuity Contract. The nature of the interest assigned is critical because Everett had no ownership interest in the Annuity Contract and thus had no rights under the Annuity Contract to assign regardless of any anti-assignment restriction in the Settlement Agreement.

The case of <u>Jack v. All State Life Ins. Co</u>., 390 B.R. 307 (Bankr. S.D. Tex. 2008) illustrates this distinction. In <u>Jack</u>, the late husband of the debtor had assigned his rights under a structured settlement agreement. <u>Id</u>. at 312-13. The debtor's spouse entered into a settlement agreement that included anti-assignment language. <u>Id</u>. As in the present case, the settlement provided that the payments under the settlement agreement would be funded by an annuity contract held by a third party. <u>Id</u>. Unlike the present case, however, the debtor's spouse entered into at least three different sales transactions with a settlement factoring company. Each time, the debtor's spouse sold a certain

-13-

portion of his settlement payments. In the last transaction, he sold all of the remaining payments due to him under the settlement agreement. Citing Settlement Funding LLC v. Garcia, 533 F.Supp.2d 685 (W.D. Tex. 2006), the Jack court explained that the debtor's spouse had no legal rights under the annuity contract and thus "owned no rights under the annuity contract which he could assign ...." 390 B.R. at 326. Moreover, the annuity contract specifically provided that the owner of the annuity had the sole right to direct payments and that this right could not be assigned.

The Jack court further explained that, even though the assigning party's rights under the annuity could not be assigned, he could assign his right to receive payments under the *settlement agreement*. Id. at 327. The court then looked to the language of the assignment agreements and concluded that all but the last assignment agreement purported to assign rights under the *annuity contract*. The court concluded that the assignee "did not acquire the correct interest under the settlement agreement" until the last assignment agreement was executed. Id. As a result, the last assignment agreement was valid, but all of the prior assignment agreements were invalid. The Jack court based its holding on Texas law, but Louisiana law does not conflict with the Texas-law underpinnings of the Jack court's holding. See, e.g., Conerly v. RegionsBank, 668 F.Supp.2d 816 (E.D. La. 2009) (an assignee steps

-14-

into the shoes of the assignor and acquires only those rights possessed by the assignor at the time of the assignment); In re Katrina Canal Breaches Litigation, 63 So.3d at 958-59; see also Marcuse v. Upton, 118 So. 790 (La. App. 1928). Moreover, the distinction drawn by the Jack court has been accepted by other courts. See, e.g., Garcia, 533 F.Supp. at 693; Western United Assurance Co. v. Hayden, 664 F.3d 833 (3d Cir. 1995); In re Brooks, 248 B.R. 99, 103 (Bankr. W.D. Mich. 2000) ("although the court does not believe that [the debtor] had an interest in the annuity..., the court nevertheless concludes that [the debtor] assigned his right to receive...the periodic payments under the release and the uniform qualified assignment and release.").

Accordingly, before the court can address RSL's waiver and standing arguments, the court must determine the interest that was assigned pursuant to the RSL Assignment Agreement. The Jack decision provides some guidance in this regard. Specifically, the court focused on language in the first two assignment agreements that referenced the annuity contract and the settlement agreement and concluded that the agreements made no distinction "between a right to payment under the annuity and the settlement agreement." 390 B.R. 307 at 327. Here, the RSL Assignment Agreement similarly does not draw a distinction between the Settlement Agreement and the Annuity Contract. The RSL Assignment Agreement states that

-15-

Everett "is entitled to annuity payments (collectively referred to as the "Periodic Payments") as a result of an order dated on or about September 15, 2007 (the "Settlement Agreement")...." (Jt. Tr. Exh. #6 at 1). The RSL Assignment Agreement further states that PICA, as the annuity issuer, has "the continuing obligation to make the Periodic Payments to the Assignor under the Settlement Agreement **and pursuant to annuity policy no. SGN000000070**...." (Id.) The RSL Assignment Agreement then states that "the Periodic Payments are being made by the Annuity Issuer" and defines the "Assigned Payments" as certain of these "Periodic Payments". (Id.) Finally, the specific assignment language in paragraph 1 of the RSL Assignment Agreement states that Everett "hereby sells, assigns, and transfers to RSL Funding or its designated assignee, all of the assignor's right, title and interest (including all benefits and rights relating thereto) in and to the **Assigned Payments**." (Id.) The actual assignment was thus a subset of the "Periodic Payments" which, in turn, are defined as payments made pursuant to the Annuity Contract. Thus, like the invalid assignments in Jack, the RSL Assignment Agreement purportedly assigns rights under the Annuity Contract that Everett did not possess.

Additional language in the RSL Assignment Agreement and the Bill of Sale similarly show that the RSL Assignment Agreement attempts to assign an interest under the Annuity Contract, not the

-16-

Settlement Agreement. First, the RSL Assignment Agreement requires Everett to direct the "Annuity Issuer" (i.e. PICA) to deliver all "Assigned Payments" to RSL and conditions RSL's performance on receipt of documentation confirming the assignability of the *annuity payments*, not the assignability of Everett's rights under the Settlement Agreement. Specifically, paragraph 7 of the RSL Assignment Agreement provides:

> The obligations of RSL Funding to make the payments due under this Agreement is subject to RSL Funding receiving such documentation and have executed such agreements as RSL Funding and its affiliates may require, at its sole discretion, that the Assigned Payments are existing as represented and that they can be assigned. This will include inquires [sic] and agreements with the Annuity Issuer.

The right to direct payments under the Annuity Contract is a right that is expressly reserved to PRUCO. RSL and Everett also executed a separate "Bill of Sale" in connection with the RSL Assignment Agreement. (Jt. Tr. Exh. #7). Paragraph 2 of the Bill of Sale states that Everett does "irrevocably grant, assign, convey, transfer and deliver unto the Buyer, its successors and permitted assigns, all of Seller's right, title and interest **under the Annuity Contract to the extent of the Assigned Payments.**" (Id. at ¶2) (emphasis added). Considering the language of the RSL Assignment Agreement and the Bill of Sale, the assignment in the present case – like the invalid assignments in Jack – was an attempt to assign rights under the Annuity Contract that were held

-17-

by PRUCO, not Everett.

RSL alternatively argues that, even if the RSL Assignment Agreement attempted to assign rights under the Annuity Contract that Everett could not assign, the agreement also independently assigned Everett's rights under the Settlement Agreement. Thus, even if the assignment with respect to the Annuity Contract is invalid, the separate assignment of rights under the Settlement Agreement is valid. The language of the RSL Assignment Agreement and the Bill of Sale do not support this argument. As in the Jack case, the RSL Assignment Agreement references the Settlement Agreement without distinguishing between payment rights under the Settlement Agreement and the Annuity Contract. Moreover, the Bill of Sale confirms that the interest that was intended to be assigned was Everett's purported rights under the Annuity Contract. The fact that RSL's performance under the RSL Assignment Agreement was also contingent on further assurances or agreements with PICA that the annuity payments could be re-directed to RSL further undercuts RSL's argument.

In sum, Everett had no legal interest in the Annuity Contract that could be assigned to RSL and the Annuity Contract grants PRUCO the exclusive right to direct annuity payments. Accordingly, the purported assignment of Everett's rights under the Annuity Contract is invalid. The court finds in favor of PICA and Everett with respect to RSL's claim for declaratory relief on the validity of

-18-

the assignment.

## C. Breach of Representations and Warranties

RSL further asserts that, if the assignment is invalid, Everett breached the representations and warranties in paragraph 6 of the RSL Assignment Agreement. (Jt. Tr. Exh. #6 at ¶ 6). Specifically, paragraphs 6(b) and 6(c) state:

> b. Assignor is the sole holder of the entire right, title, and interest in and to the Assigned Payments and under the above referenced Servicing Arrangement, the Assignor may be the sole holder of the remainder of the difference between the Assigned Payments and Periodic Payments with full power and authority to enter into and perform all of Assignor's obligations under this Agreement, without the need to obtain the consent of any third party to do so. It is Assignor's sole responsibility promptly to obtain any consents, waivers, or releases needed.
>
> c. Assignor is entitled to the Assigned Payments, free and clear of any right, interest, lien, charge, encumbrance, or claim of any other person. Assignor has not previously conveyed, sold, assigned, pledged, or otherwise encumbered any portion of the Assigned Payments, to any person or entity. No other person, with or without Assignor's knowledge or consent, has previously conveyed, sold, assigned, pledged, or otherwise encumbered any portion of the Assigned Payments, to any person or entity. RSL Funding and its affiliates are authorized by Assignor, and Assignor has obtained and/or provided all required authorizations to, obtain and file any document as RSL Funding deems appropriate to effect the sale of the Assigned Payments.

-19-

(Id.) RSL contends that Everett made an unqualified representation that the "Assigned Payments" were assignable and that RSL suffered damages as a result of that misrepresentation. RSL also contends that Everett failed to follow through with his commitment "to obtain any consents, waivers, or releases needed" or to "obtain and file any document as RSL Funding deems appropriate to effect the sale of the Assigned Payments." (Id. at ¶ 6(c)). Since RSL never paid Everett for the assignment of annuity payments, RSL seeks to recover the benefit of its bargain had the assignment been consummated: the value of the annuity payments minus the amount RSL was to pay for those payments. RSL also contends that it has incurred approximately $370,000 of attorneys' fees arbitrating and litigating in state court and bankruptcy court with Everett and PICA.

The court finds in favor of Everett on RSL's claim for breach of the representations and warranties for two reasons. First, the record does not support a damages claim based on a breach of the representations and warranties in paragraph 6 of the RSL Assignment Agreement. Courts have generally required some showing of a party's reliance on representations in order to link those representations to any damages suffered as a result of untrue representations. See Southwestern Bell Telephone Co. v. Marketing Onhold, Inc., 308 SW 3d 909, 921 (Tex. 2010) (breach of warranty

-20-

"requires proof of some form of reliance."); see also American Tobacco Co. v. Grinnell, 951 SW 2d 420, 436 (Tex. 1997) (same); see also McManus v. Fleetwood Enterprises, Inc., 320 F.3d 545, 550 (5th Cir. 2003) (recognizing that recovery by a warranty claim requires some showing of reliance). While Louisiana courts have not directly addressed this reliance requirement, Louisiana courts require some showing that the breach of representations and warranties caused the damages claimed by the non-breaching party. See, e.g., Capital One, N.A. v. Nicoll, 113 So.3d 1158 (La.App. 5 Cir. 3/27/13). Accordingly, there is no true conflict between Louisiana and Texas law with respect to RSL's claim.

Here, the record shows that RSL knew about the assignment restrictions in the settlement documents and that Everett was not the owner of the Annuity Contract before entering onto the RSL Assignment Agreement. Indeed, Everett specifically disclosed these provisions to RSL. (See May 23, 2013 Trial Transcript at 180). RSL acknowledged the potential dispute over assignability by including provisions in the RSL Assignment Agreement that conditioned RSL's obligation to perform on a subsequent determination that the payments could be assigned. (Jt. Tr. Exh. #6 at ¶ 7). Although RSL contends that it subsequently decided that the Assigned Payments were assignable, RSL never paid Everett the amounts required under the RSL Assignment Agreement. (May 23,

-21-

2013 Trial Transcript at 198). Accordingly, RSL cannot recover its benefit of the bargain because the assignment was invalid from the outset. Nor can RSL recover these damages based on a claim for breach of representations and warranties because the assignability problems were fully disclosed to RSL before it entered into the RSL Assignment Agreement. As far as attorneys' fees, these fees were incurred litigating the very assignability problem that was disclosed to RSL prior to entering into the RSL Assignment Agreement.

Second, the record also does not support RSL's contention that Everett breached his "duty to cooperate" under paragraph 6 of the RSL Assignment Agreement. Everett acknowledged that he attempted to terminate the assignment when RSL failed to pay the purchase price. However, the record also shows that Everett cooperated with RSL in the subsequent arbitration and state court litigation by entering into consent arbitration awards that re-directed the annuity payments. (See May 24, 2013 Trial Transcript at 51-52, 244, 259, 273). Any losses by RSL in the form of litigation costs and attorneys' fees did not result from Everett's actions or inactions, but from the fact that the subject of the RSL Assignment Agreement was not properly assignable. See, e.g., Keller Foundations, Inc. v. Wausau Underwriters Ins. Co., 626 F.3d 871, 874-78 (5th Cir. 2010); see also Texas Farmers, Ins. Co. v. Gerdes, 880 SW 2d 215,

-22-

218 (Tex. App. -- Forth Worth 1994 writ denied). Accordingly, RSL is not entitled to a declaratory judgment that Everett breached the RSL Assignment Agreement or any of the representations and warranties in that agreement, nor is RSL entitled to recover any damages based on these alleged breaches.

## D. RSL's $1,000 Advance to Everett

RSL also seeks recovery of the $1,000 loan advance made to Everett at the time the parties executed the assignment documents. After considering the record, the court concludes that RSL is entitled to recover this advance.

### CONCLUSION

For the foregoing reasons, the court DENIES the RSL motion for summary judgment, the Everett motion for summary judgment, and the PICA motion for summary judgment in their entirety. The court DENIES RSL's claims for declaratory relief and damages based on the RSL Assignment Agreement. The court GRANTS RSL relief with respect to the $1,000.00 loan paid to Everett in connection with the assignment of annuity payments. RSL, therefore, is entitled to judgment for $1,000.00 and any interest accrued thereon. In all other respects, the court DENIES the relief requested in RSL's complaint. Counsel for Everett shall submit a judgment in conformity with the court's ruling herein within thirty (30) days.

### 

-23-